UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN HATCH<br>Plaintiff | : | C.A. No. 2005-155 (S) |
| v. | : | |
| PITNEY BOWES, INC.<br>Defendant | : | |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS**

Now comes the Plaintiff, Stephen Hatch, in the above-captioned action and hereby objects to the Rule 12(b)(6) Motion to Dismiss filed by Defendant Pitney Bowes, Inc. As grounds for his objection Plaintiff relies upon the Memorandum of Law filed herewith.

PLAINTIFF STEPHEN HATCH
By his Attorney,

N.K. Clapham

Noelle K. Clapham (5338)
24 Salt Pond Road, Suite A-8
South Kingstown, RI 02879
(401) 783-3600
(401) 783-3670 (fax)
claphamlaw@verizon.net

**CERTIFICATION**

I hereby certify that on this 8th day of August, 2005, I mailed a true and complete copy of the foregoing to Defendant's counsel of record: Thomas J. McAndrew, Esquire, Thomas J. McAndrew & Associates, One Turks Head Place, Suite 205, Providence, RI 02903; Nicole A. Diller, Esquire and Andrew C. Sullivan, Esquire, Morgan Lewis & Bockius LLP, One Market, Spear Street Tower, San Francisco, CA 94105.

N.K. Clapham

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN HATCH<br>Plaintiff<br><br>v.<br><br>PITNEY BOWES, INC.<br>Defendant | :<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 2005-155 (S) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiff filed a Complaint against the Defendant in this matter on April 14, 2005. The Complaint alleges nine (9) counts of violations of law: 1). 29 U.S.C. § 1132; 2). Breach of Contract (Settlement Agreement); 3). Equitable Estoppel; 4). Retaliation and On-going Discrimination, 42 U.S.C § 12101 et seq., Americans with Disabilities Act ("ADA"); 5). Retaliation and Discrimination, R.I.G.L. § 28-5-7 (Rhode Island Fair Employment Practices Act (FEPA)); 6). Retaliation and Discrimination, R.I.G.L. § 42-112-1 (Rhode Island Civil Rights Act); 7). Breach Of Contract (LTD Plan); 8). Breach of Fiduciary Duty; and 9). Injunctive Relief.

Defendant seeks the complete dismissal of Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), failure to state a claim. Defendant's primary arguments are three (3) affirmative defenses articulated in its motion that Defendant is not a proper party to this litigation and that Plaintiff named the wrong party in the suit, that Plaintiff failed to exhaust administrative remedies and that all Plaintiff's remaining claims are Employment Retirement Income Security Act (hereinafter "ERISA") pre-empted.

With respect to Count I, the ERISA violation, Plaintiff disputes naming the wrong party, as both a matter of fact and law. Plaintiff sets forth in this legal memorandum facts and law that support the conclusion that the actions of the corporate Defendant caused it to become so enmeshed in the involvement of benefit administration and determination that it is now indistinguishable from the Plan and the two (2) entities are one and the same for the purposes of this litigation. Further no requirement to exhaust administrative remedies existed and cannot bar Plaintiff's litigation. With respect to the remaining Counts, the following Counts are not ERISA pre-empted and are not subject to12(b)(6) dismissal: II, III, IV, V, VI and IX. With respect to the remaining Counts, VII and VIII, Plaintiff concedes that the breach of contract count based upon the "LTD Plan" is ERISA pre-empted and that the breach of fiduciary count needs to be pled with greater specificity to cite to ERISA. According, Plaintiff will be moving to Amend his Complaint forthwith.

## II. FACTS

By letter dated April 16, 1998, Plaintiff Stephen Hatch was informed that he was eligible to receive LTD benefits effective February 1, 1998 (See "Exhibit A" attached hereto, hereinafter referred to as "Pitney Bowes Benefit Approval Letter") pursuant to the Pitney Bowes Long-Term Disability Plan (hereinafter the "Plan"). This letter specifically set forth the exact amount of Plaintiff's monthly Long Term Disability ("LTD") benefit and a detailed explanation of how this amount was calculated in accordance with the provisions of the LTD Plan.

After receiving benefits pursuant to the terms of the Pitney Bowes Benefit Approval Letter for nearly five (5) years, Plaintiff received a letter from Barbara Bianco, dated August 7, 2003, advising him that his monthly benefit rate was initially calculated incorrectly (See "Exhibit B" attached hereto, hereinafter referred to as "Bianco Overpayment Letter"). The Bianco

Overpayment Letter reaffirmed Plaintiff's entitlement to receive LTD benefits, but asserted that during a routine file review it was suddenly discovered that Plaintiff's benefit rate was incorrectly calculated initially, and that is benefits must be substantially reduced. The letter essentially states that although Plaintiff will technically continue to be eligible for and to receive LTD benefits at a substantially reduced rate, Plaintiff will not receive any further benefits until the amount that he was overpaid due to the so-called mistake has been wholly recouped. Nowhere in the Bianco Overpayment Letter is Plaintiff's entitlement to continue to receive LTD benefits disputed. The Bianco Overpayment Letter further never makes mention of or refers to any denial of Plaintiff's benefit or any internal appeal process available to the Plaintiff to dispute the overpayment.

In response to the Bianco Overpayment Letter, undersigned counsel telephoned Ms. Bianco as specifically invited in her letter.[1] Ms. Bianco did not answer the call and undersigned counsel left a detailed telephone message on her extension. No return telephone call was ever received from Ms. Bianco. Instead, several days later Plaintiff's counsel received a telephone call from the personal secretary of Defendant Pitney Bowes, Inc. corporate counsel, Rosalind Gordon, instructing undersigned counsel not to call Ms. Bianco again, but to direct all communications to Attorney Gordon. After a period of time undersigned counsel and Attorney Gordon spoke on two (2) occasions, wherein Attorney Gordon reiterated to Plaintiff's counsel not to contact Ms. Bianco, but to direct all communications to her at her office at Defendant's corporate headquarters. Ultimately Attorney Gordon advised Plaintiff's counsel that the decision set forth in the Bianco Overpayment Letter could not be changed or negotiated. Plaintiff's

[1] The Bianco Overpayment letter specifically states on page 3: "Stephen, I know that you will have many questions and concerns when you receive this letter. Please feel free to call me at 1-800-932-3631, option2, option 4, ext. 7190."

counsel specifically inquired whether or not any further internal appeals were available and was advised by Attorney Gordon that Plaintiff's only recourse was to file a lawsuit in federal court pursuant to ERISA. (See Affidavit of Plaintiff's counsel attached hereto as "Exhibit C").

The basic facts of the underlying litigation are fully alleged in Plaintiff's Rule 12.1 Statement of Undisputed Facts filed herewith and in Plaintiff's Complaint. In summary, Plaintiff settled prior discrimination litigation before this Court in negotiated reliance that he would continue to receive the amount of LTD disability benefits that he was presently receiving at the time of settlement. Part of the basis for Plaintiff's present Complaint before this Court is that this so-called benefit calculation mistake is again a pretext for discriminating against the Plaintiff. Plaintiff's former civil suit filed with the Court was dismissed after negotiation of a mutually agreeable settlement, consisting of eight (8) pages and four (4) attachments. An express provision of the written settlement agreement entered into to dispose of the prior discrimination litigation states in paragraph 5:

> Hatch acknowledges that the payments provided for by paragraph 2 are in addition to and are not in place of any payment, benefit or other thing of value to which Hatch might otherwise be entitled under any policy, plan or procedure of PB [Pitney Bowes] or pursuant to any prior agreement or contract with PB. PB acknowledges that Hatch will continue to maintain that status, and receive those benefits, to which he is entitled as an employee on long-term disability leave ("LTD") pursuant to the terms of the LTD Summary Plan, as long as he continues to remain eligible under the requirements of the LTD Summary Plan.

See "Exhibit D" attached hereto. Plaintiff includes a breach of contract claim in his complaint based upon this language contained in the January 20, 2002 settlement agreement. Plaintiff has brought additional causes of action based upon the facts cited herein and the documents referenced herein and/or attached as exhibits hereto.

## III. LEGAL STANDARD

Defendants have moved pursuant to F.R.C.P. 12(b)(6) to dismiss Plaintiff's complaint in its entirety. In considering such a motion, it is well established that the "sole function of [the Court] is to test the sufficiency of the complaint." *Martin v. Howard*, 784 A.2d 291, 297-98 (R.I. 2001) (quoting *Rhode Island Affiliate, ACLU, Inc. v. Bernasconi*, 557 A.2d 1232, 1232 (R.I. 1989)). That is, this Court must look no further than the complaint and assumes the allegations contained therein "to be true and views the facts in the light most favorable to the plaintiffs." *Giuliano v. Pastina, Jr.*, 793 A.2d 1035, 1036-37 (R.I. 2002) (quoting *Martin v. Howard*, 784 A.2d 291, 297-98 (R.I. 2001)). This Court should not grant the motion "unless it appears to a certainty that [the Plaintiff] will not be entitled to relief under any set of facts which might be proved in support of [her] claim." Id. at 1037 (quoting *Bragg v. Warwick Shoppers World, Inc.*, 102 R.I. 8, 227 A.2d 582, 584 (R.I. 1967)). See also the liberal notice pleading requirement of F.R.C.P. 8. *Caperoundo-Rivera v. Fagundo*, 2005 U.S. App. LEXIS 13134.

However, in the instant case, Defendant has set forth legal and factual arguments in its motion ,and introduced materials in support of its motion, that are outside the scope of Plaintiff's pleadings. These actions by the Defendant raise a red flag to this Court that Defendant's motion should either be summarily dismissed, or in the alternative converted into one for summary judgment. F.R.C.P. Rule 12 (b)(6) states: "if matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."[2]

---

[2] Despite the submission of additional evidence to the Court by both parties in support of their respective positions on this motion, Plaintiff respectfully submits that Court should not decide this entire matter based upon a summary judgment standard because the parties have yet to commence discovery. Plaintiff has not yet had an opportunity to develop a complete record in support of his allegations, nor to probe the materials submitted by the Defendant in

To prevail on a summary judgment motion, the moving party must identify the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)); *McConaghy v. Sequa Corp.*, 294 F. Supp. 2d 151, 159 (D.R.I. 2003).

Plaintiff respectfully submits that in this instance the Court should adhere to the narrow and limited focus appropriate to a Motion to Dismiss with respect to all aspects of the motion except the three (3) affirmative defenses raised by the Defendants that Plaintiff "named the wrong party", that the Plaintiff "failed to exhaust administrative remedies" and that Plaintiff's remaining counts are ERISA pre-empted as a matter of law. Plaintiff respectfully submits that these affirmative defenses should be fully adjudicated at this time. This Court has the authority to adjudicate these affirmative defenses on this motion. *Colonial Mortgage*, 324 F.3d at 16. Two (2) conditions must be met in order for this Court to find for the Defendant with respect to these defenses. First, "the facts that establish [each] defense must be definitively ascertainable from the allegations of the complaint . . . matters of public record, and other matters of which the court may take judicial notice." Id.; *Blackstone Realty L.L.C. v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001). Second, "the facts so gleaned must conclusively establish the affirmative defense." *Colonial Mortgage*, 324 F.3d at 16; see also *Blackstone Realty L.L.C.*, 244 F.3d at 197; *Greene v. State of Rhode Island*, 398 F.3d 45 (1st Cir. 2005); *5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure* § 1357, at 708-32 (3d ed. 2004) (citing numerous cases considering affirmative defenses on motions to dismiss). Defendant does not sustain either

---

support of its motion. *Corsini v. United Healthcare Corporation*, 965 F.Supp. 265 (D.R.I. 1997)(ERISA plan participants alleging ERISA claims against parent corporation of administrator of ERISA plan were entitled to discovery to determine whether parent corporation was an ERISA fiduciary.) See, *Gray v. Derderian*, 371 F. Supp. 2d 98 (May 24, 2005).

factor and its affirmative defenses should now be denied based upon a summary judgment standard, considering all of the materials provided by the parties.

## IV. LEGAL ARGUMENT

### A. PROPER PARTY

Defendant correctly asserts that generally, an employee benefit plan itself is ordinarily the primary defendant in an action to recover benefits. However, it has also been recognized that a defendant other than the Plan may be a proper party in a claim for benefits; a plan administrator may also be a proper party. *See, e.g., Price v. Xerox Corporation*, 2005 WL 1802130, at 2 (D. Minn. 2005). Courts have recognized that a *de facto* administrator as opposed to a named administrator may be a proper party against whom a participant may obtain relief. *See id.* Our own First Circuit Court of Appeals agreed in *Law v. Ernst & Young*, 956 F.2d 364 (1st Cir. 1992). In *Law*, the plaintiff was a participant in an employer sponsored retirement plan. The plaintiff left that employer, and approximately five years later wrote to that employer requesting information regarding his benefit rate for early retirement at age fifty-five (55). *See id.* at 365. The plaintiff received acknowledgement of his inquiry typed on his former employer's letterhead, signed by an "administrative assistant" of the firm's "Retirement Benefits Department". The plaintiff later received a second letter, again typed on his former employer's letterhead, providing the requested benefit amount, and instructing him to contact the "Management Committee" through its chairman. The signatory of the letter, Rosemary V. Kalin, provided no job title. *See id.* at 366. The plaintiff then wrote to the "Management Committee Chair", but received no answer. The plaintiff wrote to the Chair again. Ms. Kalin replied again. This time, Kalin identified herself as the "Partner Information Coordinator", and informed the plaintiff that due to tax law changes Robert Brewster would be contacting him. When Mr.

Brewster contacted plaintiff, he identified himself as the "Director of Finance," and a former colleague of the plaintiff. *See id.* Brewster's letter provided information as to how the plaintiff was to go about beginning to draw his retirement benefits, and instructed the plaintiff to direct questions to Kalin or Brewster. When the plaintiff's first pension check was surprisingly much less than the figure previously quoted, the plaintiff (this time through counsel) yet again contacted his former employer. The former employer confirmed the reduced benefit amount. *See id.*

As a result plaintiff Law brought a number of claims against his former employer under ERISA, including a claim for penalties pursuant to 29 U.S.C. § 1132(c)(1).[3] On appeal, the employer argued that lower court had erred in imposing liability under 29 U.S.C. § 1132(c)(1) because the employer was not named as the Plan Administrator in the Plan documents; rather a "Retirement Committee" appointed by the employer's Management Committee was so named. *See id.* at 372. The First Circuit disagreed with the employer's position, citing with approval a number of decisions from other circuits holding that an employer could become a *de facto* Plan administrator:

> We think this principle is correct and that it applies to Law's § 1132(c) claim. If, to all appearances, Arthur Young acted as the plan administrator in respect to dissemination of information concerning plan benefits, it may properly be treated as such for purposes of the liability provided under § 1132(c). To be sure, § 1002(16)(A)(i) states that the plan administrator is the party "specifically so designated" by the plan documents, and those documents named the Arthur Young Retirement Committee. But 29 U.S.C. § 1025 also confers upon plan participants and beneficiaries an absolute right to receive from the administrator information of the type sought here; and where an entity of which the administrator is part in effect holds itself out as the plan administrator by officially disseminating such information, we think it is subject to § 1132(c) liability should it fail to discharge that role in a proper way. Hence, where as here plan documents place the responsibility for providing information upon an internal committee of a firm, but the firm in practice carries out that function, we

[3] That statute imposes monetary penalties on plan administrators failing to provide beneficiaries information regarding benefits within a certain time frame.

> see no reason not to hold the firm liable under § 1132(c) when it fails to provide the information in the timely manner required by law.
>
> This conclusion is consistent with the intent of Congress that employees have a remedy when they are denied timely information about their ERISA benefits. To hold that an entity not named as administrator in the plan documents may not be held liable under § 1132(c), even though it actually controls the dissemination of plan information, would cut off the remedy Congress intended to create. If a company ignored in practice any distinction between the administrator and itself, and assumed responsibility for responding to plan inquiries (as Arthur Young appears to have done here), both it and the purported plan administrator would be immune from liability. A § 1132(c) suit against the company would fail, because the company itself was not named administrator in the plan documents. Likewise, a suit against the plan administrator would fail, because employees would have had no reason to request information from the plan administrator if company personnel assumed responsibility for such requests. There being no request to the designated plan administrator, that entity could not be held liable for failure to respond properly.

*See id.* at 373. The First Circuit then found that there was more than sufficient information on the record to support the trial court's conclusion that the plaintiff's employer had assumed administrative control, at least insofar as the dissemination of information was concerned. Not only did the Plan documents show that the employer exercised control over the Retirement Committee in terms of appointment and removal, but the employer also paid the Plan's expenses and provided insurance. *See id.* The Court further found the employer's conduct particularly significant in that it failed to maintain an identity separate and apart from the Plan and its named administrator:

> To be sure, these relationships would not by themselves prevent the Committee from maintaining an identity distinct from Arthur Young if the former had taken reasonable steps to preserve the separation, such as by using identifying stationery. But the closeness of the two entities assumes particular significance when added to the fact that Law's request was processed by Arthur Young employees using firm stationery, who never once mentioned the Committee nor indicated they were not working for Arthur Young itself.
>
> . . .
>
> The record contains nothing to show, throughout the entire eight month course of these contacts, that Law's request was ever forwarded to the Retirement Committee as such or that the people dealing with Law were acting on the

> Retirement Committee's behalf. Instead, persons presenting themselves solely as officials of Arthur Young, including its director of finance and the partner information coordinator (who appears to have responded to correspondence addressed to the chairman of the Management Committee) responded, on Arthur Young stationery, to Law's inquiries and provided him with information. The district court was entitled to conclude from this evidence that Arthur Young itself was voluntarily assuming, and that it controlled, the information-providing function (at least) of the Retirement Committee. We hold, therefore, that the court properly treated Arthur Young as the *de facto* plan administrator for purposes of Law's § 1132(c) claim. We therefore affirm the lower court's judgment for $12,600 against Ernst & Young.

*See id.* at 373-74. *See also Terry v. Bayer Corp.*, 145 F.3d 28, 35 (1st Cir. 1998), *citing Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997) ("[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan."); *Burchill v. Unumprovident Corporation*, 2003 WL 21524730 (D. Me. 2003); *Foulke v. Bethlehem 1980 Salaried Pension Plan*, 565 F.Supp. 882, 882 (E.D. Penn. 1983).

Here, as in *Law*, there is more than ample evidence to show that the Defendant failed to maintain a distinction between itself and the Plan, to the point that the Defendant should rightfully be treated as the Plan Administrator for the purposes of this litigation. As the Plan documents themselves expressly indicate, Pitney Bowes did not completely divorce itself from the administration of the Plan, but kept its hand well in the day-to-day operations thereof. See Sections 7.1 and 7.6 of the Plan.[4] While this Plan language on its face might not be enough to

---

4 7.1 The Committee – Employee Benefits Committee shall be responsible for the general administration of the Plan and for carrying out the provisions thereof. The Employee Benefits Committee shall have powers necessary to enable its members to properly carry out their duties, subject at all times to the limitations and conditions specified in or imposed by the Plan. The Employee Benefits Committee has delegated ongoing, day-to-day administrative responsibility under the Plan to the Pitney Bowes Disability Department and the Benefits Department.
7.6 Plan Administrator – The Employee Benefits Committee shall be the "Plan Administrator" of the Plan for purposes of ERISA. However, the Employee Benefits Committee has delegated to the Benefits Department of Pitney Bowes Inc. administrative responsibility regarding Employee enrollment in the Plan, including developing and implementing procedures and practices on the election of coverage hereunder and the levels of coverage offered to Employees. It is intended that neither the Disability Department for the Benefits Department shall have discretion such that individuals performing services in these Departments with respect to the Plan would be considered to be "fiduciaries" within the meaning of Section (3)(21) of ERISA. The Disability Department shall mean the department at Pitney Bowes Inc. having responsibility for the administration of the Company's disability program.

erode the boundaries between the Defendant and the Plan, certainly the behavior of Pitney Bowes in connection with this matter did. As in *Law*, the Bianco Overpayment letter sent to Plaintiff informing him the alleged miscalculation came on Pitney Bowes stationery. See Exhibit B.

It was that correspondence from Pitney Bowes stationery, and not the Plan Administrator, that informed the Plaintiff that he would receive no more benefits until such time as the overpayment had been recouped. Also as in *Law*, the letter goes on to direct the plaintiff to contact Ms. Bianco, to discuss his concerns and questions. Ms. Bianco, like the employer's officials in *Law*, failed to identify herself as an employee of the Plan. Further, when Plaintiff tried to communicate with Bianco, corporate counsel for the Defendant immediately prevented the communication took over interactions with Plaintiff and his counsel. As such, there is at very least a material question of fact as to whether the Defendant was acting as the decision-maker in this matter, and should be treated as such for purpose of any review of its actions. *See Terry*, 145 F.3d at 36. Indeed this Court specifically recognized in *Corsini v. United Healthcare Corporation*, 965 F. Supp. 265 (D.R.I. 1997) that a parent corporation could be a proper defendant in ERISA litigation even though the corporate entity attempted to insulate itself from liability by filing a motion to dismiss alleging lack of subject matter jurisdiction because the corporate parent was not the plan administrator. In *Corsini*, this Court denied the motion to dismiss, holding that the parent corporation could be subject to liability and that the Plaintiff was permitted to conduct discovery on that issue.

---

The Disability Department shall not prescribe a treatment program for Employees regarding their return to work but rather shall work with practitioners to develop suitable and appropriate treatment regimens.

At least insofar as the matter of the alleged benefit calculation "mistake" and overpayment are concerned, Defendant Pitney Bowes effectively grabbed the steering wheel from the Plan administrator.

## B. EXHAUSTION REQUIREMENT

Plaintiff is not subject to an administrative remedies exhaustion requirement. According to the Plan language, a prerequisite to administrative appeal exhaustion requirements is a written denial of a claim, setting forth the appeal procedure in the text of the document. The Bianco Overpayment Letter is devoid of any appeal procedure and never refers to the so-called benefit calculation error and overpayment issue as a "claim denial". To the contrary, the Bianco Overpayment Letter affirms Plaintiff's entitlement to benefits. In addition, ERISA mandates that appeal procedures be clearly set forth in any claim denial letter. Finally, corporate counsel's statements to Plaintiff's counsel denying the existence of internal appeal processes and confirming that Plaintiff's only remedy was to file suit in federal court pursuant to ERISA waived any such exhaustion requirements even if they did exist.

The doctrine of administrative exhaustion is not absolute, but discretionary.[5] Furthermore, a would-be ERISA plaintiff is excused from the failure to exhaust remedies where the pursuit of administrative relief is futile, and/or where the plaintiff has been wrongfully denied meaningful access to administrative relief. *Corsini v. United Healthcare Corporation*, 965 F. Supp. 265 at 269 (D.R.I. 1997)("The law does not requires parties to engage in meaningless acts or to needlessly squander resourced as a prerequisite to commence litigation"). See *Foy v. Jeffery A. Singer, P.C.*, 1992 WL 192590, at 2 (E.D. Pa. 1992). This is particularly so in the

[5] ERISA itself does not mandate exhaustion of administrative remedies. *See, e.g., In re Blue Cross of Western Pennsylvania Litigation*, 942 F.Supp. 1061, 1065 (W.D. Penn. 1996) Instead, exhaustion is a judicially-imposed requirement, aimed at ". . . minimizing the number of frivolous lawsuits, promoting non-adversarial dispute resolution, and decreasing the cost and time necessary for claim settlement." *See Gallegos v. Mt. Sinai Medical Center*, 210 F.3d 803, 808 (7th Cir. 2000).

context of a motion to dismiss, where there are allegations that the plaintiff made reasonable efforts to comply with any procedures set forth in the Plan. *See id.*

Wrongful denial of meaningful access to relief can take many forms.[6] In all of the instances cited in footnote 5, courts have held that it would constitute grave injustice to bar a plaintiff from relief due to an alleged failure to exhaust administrative remedies. *See Watts*, at 1207-08; *Gallegos,* at 809-810; *Leahy,* at 537. To require a plaintiff to exhaust administrative remedies under circumstances of this nature is to defeat one of the fundamental goals of ERISA, which is to ensure that plan beneficiaries can readily understand their rights. To this end, ERISA contains detailed provisions regarding what information must be given to participants. 29 U.S.C.A. § 1021, 29 U.S.C.A. § 1022. Barring plaintiffs' claims on the ground that they have failed to follow an ambiguous or unclear administrative review proceeding, or have reasonably relied on misrepresentations regarding the availability of that review proceeding virtually rewards the Plan fiduciaries by allowing them to profit from their failure to place the participants on notice of their rights and to thwart the fundamental goals behind the enactment of ERISA.

The crux of the dispute at issue here is the Defendant's pretextual sudden "discovery" that Plaintiff's initial benefit rate was calculated incorrectly during a supposed routine file review, nearly five (5) years after the initial benefit determination and uninterrupted payment of benefits to Plaintiff at the original rate calculation, after including specific language regarding Plaintiff's entitlement to maintain his LTD benefit status under the Plan in an eight (8) page settlement agreement with four (4) attachments drafted by Defendant's team of attorneys in compromise of Plaintiff's pending discrimination litigation before this Court in January, 2002,

---

[6] A Plan's language regarding what administrative procedures to take can prove ambiguous. *See Watts v. Bellsouth Telecommunications*, 316 F.3d 1203, 1207-08 (11th Cir. 2003). Similarly, misrepresentations have been known to take place regarding the proper administrative procedures to follow. *See Gallegos,* 210 F.3d at 809-810. A Plan sponsor may also create confusion as to how to go about initiating the review process. *See Leahy v. The Bon, Inc.*, 801 F.Supp. 529, 537 (D. Utah 1992).

and after issuing Plaintiff correspondence in March, 2003 confirming his receipt of LTD benefits under the Plan in a letter responsive to Plaintiff's request for documentation to submit to lenders for use in refinancing his home. See letter dated March 24, 2003 attached hereto as "Exhibit E".

Nowhere in the Bianco Overpayment Letter is there ever any mention of a "claim denial". Rather the letter affirms Plaintiff's entitlement to benefits pursuant to the Plan, then sets forth the opinion that the dollar amount of Plaintiff's monthly benefit was initially calculated incorrectly (which the Plaintiff wholly contests), and attempts to justify that opinion. The letter concludes by pronouncing the Plaintiff overpaid and proclaiming that all future benefits at the substantially reduced benefit rate will be held until satisfaction of the entire supposed overpayment.

29 U.S.C.A. § 1133(1) requires that adequate notice be given to any participant whose claim for benefits has been denied. The interpretative regulation for 29 U.S.C.A. § 1133(1), 29 C.F.R. § 2560.503-1(g) further details the contents of an adequate notice to be given to a participant whose claims for benefits has been denied.[7] No such notice was given to Plaintiff.

---

7 (g) Manner and content of notification of benefit determination. (1) Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant --

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,

(A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request . . . .

The language of the Plan itself also requires notification to the recipient of a claim denial of available appeal procedures. In Amendment No. 1 to the Plan (attached to Defendant's Memorandum as "Exhibit A") paragraph 5 governing "Claims Denial and Appeal Procedure" (which purports as of January 1, 2003, to entirely delete and replace Section 7.7 of the 1998 version which was in effect at the time of Plaintiff's initial benefit eligibility) mirrors ERISA's § 2560.503-1(g) in subparagraph (b).[8] The review procedures discuss the Plaintiff's rights and options if his claim for benefits is denied. The issue at hand, however, is not a denial of a claim for benefits; Plaintiff's disability has long been conceded. At best, a clear ambiguity exists as to whether the Plan even provides the Plaintiff with any appellate review and it is well-settled that ambiguities in a Plan document are construed against the drafters. *See Bergt v. Retirement Plan for Pilots Employed by Markair,* 293 F.3d 1139, 1145 (9th Cir. 2002); *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1551 (11th Cir. 1994). Accordingly, the Defendant cannot be permitted to benefit from its self-created confusion as to whether an administrative review was available for the Plaintiff in the Plan documents.

---

8 7.7. Claims Denial and Appeal Procedure – In accordance with ERISA and regulations thereunder, the Disability Department shall provide notice in writing to any person whose claim for benefits under the Plan has been denied as follows:
(a) The Disability Department will provide a written notification of its determination to the Participant within 45 from the date the claim is filed. An extension of up to 30 days is permitted if necessary due to matters beyond the Plan's control provided the Disability Department notifies the Participant, prior to expiration of the initial 45-day period, of the circumstances requiring the extension of time and the date by which the Disability Department expects to render a decision. Prior to the end of this extension period, another 30-day extension is available if it is determined that, due to matters beyond its control, a decision cannot be rendered within the initial extension period. If the reason for taking the extension is sent to the claimant until the date on which the claimant responds to the request for additional information, without regard to whether the claimant's response supplies all of the information necessary to decide the claim.
(b) The written notification shall include the reasons for the denial based on specific Plan provisions, additional information required to perfect the claim for an appeal and an explanation of the claim appeal procedure. The notification shall also include (i) a description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the Participant's right to bring civil action under Section 502(a) of ERISA following an adverse benefit determination on appeal; (ii) if an internal rule, guideline, protocol or other similar criterion was relied upon in making the determination, either the specific rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination and that a copy will be provided free of charge to the Participant upon request; . . .

The Bianco Overpayment Letter is completely devoid of any information regarding how to obtain an appeal of the determination that Plaintiff's was totally cut off from receipt of benefits until the alleged overpayment had been fully recouped using the recalculated substantially lower benefit rate. The correspondence did not notify Plaintiff of the availability of any appeal to fit these circumstances, and corporate counsel for Defendant Pitney Bowes, Inc. Rosalind Gordon specifically advised undersigned Plaintiff's counsel that no such internal appeals were available. Attorney Gordon confirmed that Plaintiff's only recourse was to file a federal court ERISA lawsuit (See attached affidavit of Plaintiff's counsel filed herewith). Such unequivocal statements regarding the unavailability of an appeal process have been recognized as excusing a plaintiff from failure to exhaust. *See Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974, 984-85 (9th Cir. 2001).

Because the Bianco Overpayment Letter did not fall under the definition of a "denial of a claim" for benefits, the above-referenced appeal procedure is not applicable to Plaintiff's situation. Accordingly, the Plaintiff cannot be faulted for failing to exhaust the only administrative appeal provided for in the Plan, that is, the one covering denial of claims. The Plan provided no other appeal procedure applicable to Plaintiff's unique predicament. Where the Plan does not provide an administrative remedy for the Plaintiff, the Plaintiff can hardly be faulted for failing to exhaust it. *See In re Blue Cross of Western Pennsylvania Litigation*, 942 F.Supp. 1061, 1064 (W.D. Penn. 1996.)[9]

Furthermore, parties claiming breach of fiduciary duty under 29 U.S.C. 1132(a)(2) or (a)(3) are not required to exhaust administrative remedies prior to bringing suit. *See In re Blue Cross of Western Pennsylvania Litigation*, 942 F.Supp. 1061, 1064 (W.D. Penn. 1996.)

---

[9] Indeed, the Defendant is supposed to be handling the daily administration of the Plan but dispite this litigation to present has still failed to direct Hatch to any appropriate appeal process that it believes he should have utilized.

**C. PRE-EMPTION**

29 U.S.C.A. § (d) Alteration, amendment, modification, invalidation, impairment, or such law.

29 U.S.C.A. § 1144(a) pre-empts state law claims that "relate to any employee benefit plan" covered by ERISA. ERISA pre-emption of state law claims, however, is not absolute. The *raison d'etre* of the ERISA pre-emption rule is to provide uniformity of administration of employee benefit plans. The drafters of ERISA believed that that uniformity would be thwarted if states were permitted to alter the administration of said plans through the application of each state's differing legal standards. *See Massey v. Stanley-Bostitch*, 255 F.Supp.2d 7 at 12 (D.R.I. 2003), *citing Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). However, ERISA pre-emption does not work to bar each and every type of state law claim that might tangentially involve an employee benefit claim in some way or another. *See, e.g., MacDougall v. Unified Retirement Plan of the Bank of New England*, 878 F.Supp. 4, 7 (D. Mass. 1995), *citing Mackey v. Lanier Collection Agency & Service*, 486 U.S. 825, 108 S.Ct. 2182, 2187, 100 L.Ed.2d 836 (1988). The test is whether the application of the state law would impact upon the terms of benefits or their applications. *See Ralph v. Lucent Technologies*, 135 F.3d 166, 171 (1st Cir. 1998).

**1. Estoppel**

Estoppel claims brought under ERISA, the Labor Management Relations Act, or other federal law are not barred by ERISA pre-emption. The Supreme Court has recognized that ERISA's "appropriate equitable relief" provision demonstrates that Congress intended that federal courts fashion federal common law under which estoppel claims may be brought

pursuant to ERISA. *See MacDougall v. Unified Retirement Plan of the Bank of New England*, 878 F.Supp. 4, 8 (D. Mass. 1995), *citing Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 156, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring in judgment). 29 U.S.C.A. § 1132(a)(3) permits a plaintiff to bring an action to "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." Our own District Court has recognized that this provision of equitable relief could be interpreted so as to allow courts to fashion an estoppel remedy, at least in instances where other remedies under ERISA are inadequate. *See Massey*, 255 F.Supp.2d at 14. *See also LaRocca v. Borden*, 276 F.3d 22, 28-29 (1st Cir. 2002).

The First Circuit Court of Appeals has had an opportunity to examine whether estoppel claims survive ERISA pre-emption. In *Law v. Ernst & Young*, 956 F.2d 364, 369 (1st Cir. 1992), the First Circuit held that estoppel claims that were based upon representations regarding an interpretation of the Plan, rather than modification thereof, could survive ERISA pre-emption. The rationale for this distinction is to preserve one of the basic intentions of the drafters of the ERISA statute, that employee benefit plans be established and governed pursuant to a written instrument. *See id.* at 370, *citing Nachwalter v. Christie*, 805 F.2d 956 (11th Cir. 1986).[10] In the instant case Plaintiff's estoppel claim is not ERISA pre-empted because it is not based upon a modification of the Plan, but instead based upon the negotiations of the parties in a settlement

[10] In *Law*, the plaintiff requested from plan administrators an estimate of the annual retirement benefit to which he would be entitled if he retired at age 55. *Id.* at 365. Administrators told Plaintiff that he would receive $19,193 per year. *See id.* at 366. When the plaintiff actually retired shortly thereafter, he was then informed that he would only receive $11,199 per year. *See id.* As the record demonstrated, the Plan had required that the plaintiff's benefits be discounted as a result of his early retirement at 55. The administrators had simply forgotten to make the discount when supplying the Plaintiff with benefit information. *See id.* at 371. This error, then, was the result of a failure to make an appropriate calculation rather any disagreement as to the interpretation of any provisions regarding how that calculation ought to be made. Therefore, the First Circuit held that this estoppel claim was that which sought a modification of the Plan, rather than an interpretation of it, and therefore ERISA pre-emption applied. *See id.* at 372.

conference held before this Court by Judge Lovegreen which resulted in a compromise of Plaintiff's pending litigation against the Defendant. During the course of the settlement conference Plaintiff made it clear to all present that his main consideration was to continue to receive LTD benefits because he was not able to work. The representatives of the Defendant[11] and its team of attorneys assured Plaintiff that if he accepted a settlement that he would continued to receive his LTD benefits. In fact, Defendants referred to the exact amount Plaintiff was receiving on LTD and used this as part of their argument to Judge Lovegreen during the settlement conference as to why they should not have to offer more in settlement of Plaintiff's pending litigation. Plaintiff never would have accepted the settlement offered by the Defendant if he knew that just two (2) years later the Defendant would reduce his LTD benefit by more than fifty percent (50%). Because the benefit rate was such an essential part to the Court negotiated settlement, this estoppel claim is not ERISA pre-empted.

**2. Discrimination**

Discrimination claims brought under state law occupy a unique place in the ERISA pre-emption jurisprudence. 29 U.S.C. 1144(d), provides that ERISA will not be construed so as to ". . . alter, amend, modify, invalidate, impair, or supersede any law of the United States." Logically, this would mean that ERISA would not work to bar a discrimination claim based upon federal law. However, Title VII and other federal discrimination laws do require initial recourse to a state administrative remedy, such as the filing of a complaint under state and federal law at the Rhode Island Commission for Human Rights. Because state laws against discrimination have long been understood to be integral to the enforcement of the federal laws against discrimination, it has been held that ERISA does not work to pre-empt a state law discrimination claim, provided that it is based upon conduct that would also be a violation of the federal

[11] Including Rosalind Gordon and Terrence Green.

discrimination law. *See Tompkins v. United Healthcare of New England*, 203 F.3d 90 (1st Cir. 2000), *citing Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 102-04, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Further, Plaintiff's right to a jury trial with respect to the discrimination allegations is absolute. See *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472-73, 8 L.Ed.2d 44 (1962).

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that Defendant's Rule 12(b)(6) Motion to Dismiss be denied and the Defendant provide an Answer to Plaintiff's Amended Complaint, which will be filed and served forthwith.

Respectfully submitted,

PLAINTIFF STEPHEN HATCH
By his Attorney,

N. K. Clapham

Noelle K. Clapham (5338)
24 Salt Pond Road, Suite A-8
South Kingstown, RI 02879
(401) 783-3600
(401) 783-3670 (fax)

### CERTIFICATION

I hereby certify that on this 8th day of August, 2005, I mailed a true and complete copy of the foregoing to Defendant's counsel of record: Thomas J. McAndrew, Esquire, Thomas J. McAndrew & Associates, One Turks Head Place, Suite 205, Providence, RI 02903; Nicole A. Diller, Esquire and Andrew C. Sullivan, Esquire, Morgan Lewis & Bockius LLP, One Market, Spear Street Tower, San Francisco, CA 94105.

N. K. Clapham