UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STEPHEN HATCH, Plaintiff, | ) |
| v. | ) C.A. No. 05-155S |
| PITNEY BOWES, INC., Defendant. | ) |

**DECISION AND ORDER**

William E. Smith, United States District Judge.

Before this Court is a Report and Recommendation ("R&R"), issued on December 1, 2005, by United States Magistrate Judge David L. Martin. Plaintiff Stephen Hatch and defendant Pitney Bowes, Inc. each filed timely objections to the R&R. Although Hatch argues that the Magistrate Judge's recommendation to dismiss his ERISA claim is in error, the central issue with which this court must contend is whether Title I of the Americans With Disabilities Act, pursuant to 42 U.S.C. § 12112, contemplates a cause of action for a totally disabled claimant. The Magistrate Judge, concluding that it did, recommended denying Pitney Bowes's motion to dismiss this claim. Review of the R&R is de novo. Fed. R. Civ. P. 72(b). This Court heard oral argument on January 23, 2006.[1]

[1]While this matter was under review, the parties requested that the court postpone its ruling because a settlement was likely. The settlement was contingent, in part, upon the completion of

I. Background[2]

Plaintiff Stephen Hatch seeks redress for alleged discrimination, retaliation, and wrongful reduction of his long term disability ("LTD") benefits by his former employer, Pitney Bowes. For over 25 years, Hatch worked in the sales department for Pitney Bowes in its Rhode Island office. In July, 1997, he took a medical leave of absence due to a mental disability ("first leave"). He returned to work in October of 1997, and continued working until January 1, 1998, when he was forced to take a second medical leave ("second leave"). Hatch remains on medical leave.

Shortly after his second leave began, Hatch received a letter from Pitney Bowes, dated April 16, 1998, informing him that he had been approved for LTD benefits effective February 1, 1998. This letter further explained that his LTD benefit amount was based on his 1997 earnings, and that he would receive a monthly check from Pitney Bowes' Payroll Department in the amount of $4,868.17. After a Social Security Disability Income offset of $1,449.00, Hatch's monthly LTD benefit total was $3,419.17. This amount remained constant, and was consistently confirmed by Pitney Bowes through

---

certain medical examinations. During a recent status conference, scheduled by the court to determine whether further delay was warranted, it became apparent that in fact no settlement was likely and the parties agreed that the court should move forward and rule on the objections.

[2] The facts set forth here are those necessary for review of the R&R; a more comprehensive discussion appears in the R&R on pages 1-4.

various letters, until August 2003.

In 1999, Hatch lodged complaints against Pitney Bowes with the Rhode Island Commission for Human Rights ("RICHR") and the United States Equal Employment Opportunity Commission ("EEOC"), alleging illegal disability discrimination. In addition, Hatch instituted a civil suit to redress the alleged illegal disability discrimination ("first action"). Ultimately, the parties entered into a mutually agreeable settlement on February 20, 2002.

Then, on August 7, 2003 Pitney Bowes sent Hatch a letter informing him that he had been overpaid by $133,075.14 due to a calculation mistake in his LTD benefits. This letter explained that the mistake had been caused by erroneously basing his LTD benefits payments on his 1997 salary, when the benefits should have been calculated based on his 1996 salary. The letter advised Hatch that according to Pitney Bowes's Long-Term Disability Plan ("Plan"), benefits are calculated by using the earnings from the full calendar year prior to the date of total disability and, because Hatch's total disability began in 1997 with his first leave, the appropriate earnings base was his 1996 salary, not his 1997 salary.[3] Basing the calculation on his 1996 salary, the

---

[3] It appears that the benefit paid during Hatch's first leave was calculated based on his 1996 salary. Although the letter is somewhat confusing, it seems to suggest that when the period worked between subsequent total disability leaves (resulting from the same cause or causes) is less than six months, the later disability leave is deemed a continuation of the prior disability leave. See Plan, § 5.10 (Recurrent Disability).

letter notified Hatch that he would receive a monthly LTD benefit of $2,851.88 per month instead of $3,419.17. The letter also informed Hatch that his payments would cease until the entire amount of overpayment had been recouped.

On May 26, 2004, Hatch again filed complaints with the RICHR and the EEOC ("second action"). This second action alleged that the so-called mistake in calculating his benefits was a pretext for illegal retaliation and discrimination. On April 14, 2005, after receiving right to sue letters, Hatch filed a nine count complaint in this Court. The nine counts are captioned as follows: I. Violation of 29 U.S.C. § 1132; II. Breach of Contract (Settlement Agreement); III. Equitable Estoppel; IV. Retaliation and On-going Discrimination Violation of 42 U.S.C. § 12101 et seq. Americans With Disabilities Act ("ADA"); V. Retaliation and Discrimination Violation of R.I.G.L. § 28-5-7 Rhode Island Fair Employment Practices Act (FEPA); VI. Retaliation and Discrimination Violation of R.I.G.L. § 42-112-1 Rhode Island Civil Rights Act; VII. Breach of Contract (LTD Plan); VIII. Breach of Fiduciary Duty; and IX. Injunctive Relief.

On July 11, 2005, Pitney Bowes filed a Motion to Dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal of all nine counts and dismissal of Hatch's

demand for a jury trial.[4] This Court referred that motion to Magistrate Judge Martin for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

II. The R&R

The R&R recommends granting in part and denying in part Pitney Bowes' Motion to Dismiss. Specifically, the Magistrate Judge recommends granting the Motion to Dismiss as to Counts I (ERISA), II (contract), III (equitable estoppel), VII (breach of contract), VIII (ERISA), and IX (injunctive relief) and denying the Motion to Dismiss as to Counts IV, V, and VI (collectively, "discrimination claims").

After review of the R&R, this court finds that the Magistrate Judge's thorough analysis for Counts II, III, VII, and IX is supported by the factual record and the applicable law. This court therefore accepts and adopts the recommended disposition for these Counts.[5] See R&R at 18-28; 40-41.

Turning to Counts I and VIII (the ERISA claims), in addition to recommending dismissal of both counts, the Magistrate Judge also recommended permitting Hatch to file an amended complaint. Id. at 6-18. Hatch objects to the recommended dismissal of Counts I and

[4] In the alternative, Pitney Bowes argues that Hatch's demand for a jury trial should be stricken pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

[5] Neither party objected to the R&R's recommendation that these Counts be dismissed.

VIII. After review of Hatch's two arguments — that the Magistrate Judge applied the wrong legal standard and that Pitney Bowes is a proper defendant because it was a *de facto* plan administrator and a co-fiduciary — this Court finds that both arguments lack merit. Thus, the Magistrate Judge's reasoning and recommendation regarding Counts I and VIII are adopted. This court also adopts the recommendation that Hatch be permitted to file an amended complaint.[6]

However, this court respectfully disagrees with part of the Magistrate Judge's analysis regarding Counts IV, V, and VI, see R&R at 28-40, and writes separately here to explain.

III. Analysis

A. Count IV

In Count IV, Hatch alleges that Pitney Bowes violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq, by both retaliating and discriminating against him. Hatch contends that the so-called benefits calculation "mistake" constitutes both a continuing course of illegal discrimination and retaliation against him because he filed the first action. Hatch does not hinge his claims under the ADA on retaliation or discrimination arising out of his actual employment. By agreeing in February 2002

[6] The amended complaint has, in point of fact, already been filed.

to a settlement of the first action, which included a release of any and all claims related to his employment, Hatch effectively waived any claim premised on any adverse employment action. Any claim under the ADA or its state corollary must, consequently, relate exclusively to the denial of benefits under the Plan.

1. Discrimination

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability . . . ." 42 U.S.C. § 12112. Further, the ADA defines "a qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential function of the employment position that [the] individual holds or desires." 42 U.S.C. § 1211(8). Hatch, however, has at all relevant times been "totally disabled," including at the time Pitney Bowes reduced his benefits. It is additionally without dispute that Hatch's total disability prevents him from "perform[ing] the essential function of the employment position" for which he was previously employed and that he falls under the Plan's definition of "totally disabled." 42 U.S.C. § 1211(8); see Complaint ¶ 17. The implicated question, then, is whether an employee or former employee who is no longer able to perform the essential functions of his job or former job (who is, in other words, totally disabled), may bring a claim under

the ADA alleging discrimination as a "qualified individual with a disability." The discrimination facet of Hatch's claim thus turns on whether Hatch can establish that he is a "qualified individual with a disability" in spite of his status as both a former employee and one who has been determined to be totally disabled from employment and receiving LTD benefits.

The Magistrate Judge concluded that a totally disabled individual, like Hatch, could, in fact, be a qualified individual under the ADA and could therefore bring a claim of discrimination to address the benefit reduction. Consequently, the Magistrate Judge declined to recommend dismissal. Pitney Bowes argues that this conclusion was in error because a totally disabled claimant, like Hatch, by definition cannot be a qualified individual with a disability under the plain meaning of the ADA, and therefore cannot bring any claim for discrimination.

As the Magistrate Judge correctly noted, the Court of Appeals for the First Circuit has yet to squarely address this issue. However, the First Circuit has held, in a somewhat analogous situation, that a totally disabled person could not assert a claim under a Massachusetts anti-discrimination statute because she was not a "qualified handicapped person" who could perform the essential job functions. August v. Offices Unlimited, 981 F.2d 576, 584 (1st Cir. 1992) ("Having conceded that he was totally disabled at all relevant times, August cannot now establish that he

was a 'qualified handicapped person' and thus cannot make out the prima facie case required to prevail on his claim . . . ."). Additionally, a more recent case, Gelabert-Ladenheim v. American Airlines, Inc., strongly suggests that the First Circuit would apply the reasoning in August to the ADA. 252 F.3d 54, 59-60 (1st Cir. 2001) (stating that under the ADA "a person cannot be totally disabled because she must be otherwise qualified to work."). Other Courts of Appeal that have rendered decisions are unambiguously split on this issue. A majority of the circuits that have spoken on this issue hold that a totally disabled individual is not a qualified individual and therefore cannot bring a claim alleging discrimination under the ADA. See Weyer v. Twentieth Century Fox, 198 F.3d 1104, 1112 (9th Cir. 2000) (announcing agreement with the Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits). However, two circuits have held, to the contrary, that totally disabled individuals are covered under the qualified individual definition and may bring ADA discrimination claims. See Ford v. Schering-Plough Corp., 145 F.3d 601, 607 (3d Cir. 1998); Castellano v. City of NY, 142 F.3d 58, 66-70 (2d Cir. 1998). Additionally, and in spite of August, a number of district courts within this circuit have aligned themselves with the Second and Third Circuits, holding that totally disabled claimants may bring claims for discrimination under the ADA. See Fletcher v. Tufts, 367 F. Supp.2d 99, 104-106 (D. Mass. 2005); Iwata v. Intel Corp., 349 F. Supp.2d 135, 144-47

(D. Mass. 2004); Conners v. Maine Med. Ctr., 42 F. Supp.2d 34, 39-45 (D. Me. 1999).

After examining the approaches of the various circuits (and the district courts of this one) the Court is persuaded that the First Circuit would follow the better reasoned approach of the majority of circuit courts and hold that the plain language of Title I of the ADA precludes a claim of employment-based discrimination for disability benefits by a claimant (such as Hatch) who is not a current employee nor able to perform the work of his (former) job by virtue of his total disability. While at once this conclusion seems to be driven by both common sense and a plain reading of the statutory language, it nevertheless requires some discussion in light of the contrary holdings of the Second and Third Circuits, and the reasoning, in Robinson v. Shell Oil, 519 U.S. 337 (1997), underlying those cases. As will be shown, these contrary holdings rest on weak footings, and the conclusion reached by those courts distends the words of the ADA to effectively expand its coverage beyond what Congress prescribed.

a. The ADA in its Context

Before the discrete questions presented here can be effectively discussed, it is necessary to briefly outline how the ADA filled unoccupied space in the statutory scheme that protects workers who become injured and/or disabled during the time of their

employment.

For many years employees enjoyed only minimal protections against the economic consequences of injury and/or disability-based discrimination, and few guarantees or protections with respect to their employer-provided benefits (such as health insurance and disability insurance). Virtually all states[7] provided workers' compensation in the event of an on-the-job injury, and a few established state disability insurance programs for non-work related injuries.[8] Some more employee-friendly or strong union states passed state statutes to require family leave or prohibit disability discrimination, and some large private sector employers voluntarily offered disability plans to compensate employees for non-occupational illnesses or accidents.[9] If an employee's

---

[7] In the early 1900s, an increase in industrial injuries and a decrease in the availability of common-law remedies combined to prompt the evolution of the American workers' compensation system. 2 A. Larson, Workers' Compensation Law § 2.07 (1997). By 1910, compensation acts had been passed in a number of states, and by 1920, all but eight states had enacted such legislation. Id. at § 2.07, § 2.08. In 1963, Hawaii became the final state to pass a compensation statute. Id. at § 2.08.

[8] In 1990, the year the ADA was passed, the American Law Institute reported that non-occupational temporary disability laws existed in Puerto Rico and in five states: California, Hawaii, New Jersey, New York, and Rhode Island. Frank J. Rief & Roberta Casper Watson, Severance and Disability Arrangements, C472 A.L.I.-A.B.A. Course of Study 1437, 1469 (March 1, 1990). Such laws were intended to provide "comprehensive and systematic provision[s] for the protection of working people against the loss of earnings due to nonoccupational sickness or accident." Id.

[9] See, e.g., Gen. Elec. Co. v. Gilbert, 429 U.S. 125 (1976). The Supreme Court's ruling in Gilbert - holding that pregnancy was

disability was permanent and he could not return to work, social security provided a safety net. See, e.g., Bowen v. City of New York, 476 U.S. 467, 469-470 (1986). And, employer sponsored short-term and long-term disability plans, where offered, bridged the gap between sick leave and permanent inability to work. However, until the mid-1970s, employers generally enjoyed a fairly free hand to modify or alter employment benefits and discriminate against employees who became disabled.[10] From within this void, many states began to enact statutes that protected workers' benefits and prohibited "handicap" discrimination. See, e.g., Mass. Ann. Laws ch. 149, § 24K (repealed 1983); R.I. Gen. Laws Ann. §§ 28-5-1 to -39 (Supp. 1976); N.H. Rev. Stat. Ann. §§ 354-A:1-A:14 (Supp. 1975). However, even with such statutes, disability and injury protection remained patchwork at best.

Over the course of the last several decades of the twentieth century, Congress moved to largely federalize the field and fill in the gaps with regard to the protection of the injured and disabled

---

a "condition," not a "disability" - laid the foundation for legislation such as the Pregnancy Discrimination Act of 1978 and, later, the Family and Medical Leave Act of 1993. See generally Jennifer Thompson, Family and Medical Leave for the 21st Century?: A First Glance at California's Paid Family Leave Legislation, 12 U. Miami Bus. L. Rev 77, 78-91.

[10] "Commentators have characterized the period from the beginning of our country through the mid-1970s as a time when public policy regarding individuals with disabilities evolved from societal indifference to charity, and from charity to civil rights." Robert L. Burgdorf, Jr., Disability Discrimination in Employment Law, 24 (1995).

against employment discrimination. In addition to the landmark ADA, which was passed in 1990, see 42 U.S.C. §§ 12101-12213, the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701, et seq. and the Family Medical Leave Act, 29 U.S.C. § 2602, et seq. (1993) are prominent examples of this effort; as well, the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA") while primarily designed to protect pension rights of employees, offers some additional peripheral protection of the injured and disabled.

The result of all of these laws is a veritable quilt of protection for employees who either become injured or disabled at work, or are prevented from working to a greater or lesser degree because of a disease or disability. The issue in this case implicates how the patchwork fits together, where the boundaries of two of these laws - ERISA and the ADA - come together and whether they leave a gap in coverage or overlap in the protective shroud they provide to disabled workers. The issue here also (and more importantly) implicates the tension present in statutory interpretation between taking the words of a statute at their plainest most reasonable meaning, and importing meaning through context and common law development in related areas of employment law.

b. Robinson

Although Robinson v. Shell Oil, 519 U.S. 337 (1997) considered

the scope and meaning of a Title VII provision (as opposed to the ADA Title I provision implicated here), it sets the framework for understanding the opposing positions of the circuits on the question presented here.[11] In Robinson, the Supreme Court addressed whether the word "employees" in 41 U.S.C. § 2000e-3(a) (Title VII's antiretaliation provision) included former employees. 519 U.S. at 339. Noting that

> [t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole[,]

the Court proceeded to analyze whether the term "employee" was ambiguous. Id. at 341. With respect to the language itself, the Court rejected a "first blush" interpretation that "employees" referred only to those having an existing employment relationship with the employer primarily because there was no "temporal qualifier . . . such as would make plain that § 704(a) protects only persons still employed at the time of the retaliation." Id. Although the Court never defined a "temporal qualifier," it proffered phrases like "former employee," "current employee," "is

---

[11] A number of the relevant opinions were decided before Robinson. See Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006 (6th Cir. 1996), rev'd on other grounds, 121 F.3d 1006 (6th Cir. 1997) (en banc); EEOC v. CAN Ins. Cos., 96 F.3d 1039 (7th Cir. 1996); Gonzales v. Garner Food Services, Inc., 89 F.3d 1523, 1531 (11th Cir. 1996); August, 981 F.2d at 584 (1st Cir. 1992); Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768 (8th Cir. 1987). Nevertheless, as discussed below, Weyer, although decided after Robinson, affirms the position taken by these pre-Robinson decisions.

employed," and "was employed," as examples of terms that could fix the meaning of "employees" to specify the time frame in which the employment relationship must exist. Id. at 342.[12]

Looking also to the broader context in which the term "employee" is used in Title VII, the Court likewise found nothing to compel a particular meaning of the term. Because the term, in other sections of Title VII, referred alternately to "current employees" only, see §§ 703(h), 717(b), or "something more inclusive or different than 'current employees,'" see §§ 706(g)(1), 717(b), the Court concluded that "[o]nce it is established that the term 'employees' includes former employees in some sections, but not in others, the term standing alone is necessarily ambiguous." Id. at 342-43.

Finally, the Court analyzed the specific section in play "to determine whether the context gives the term a further meaning that would resolve the issue." Id. The Court rejected Shell Oil's contention that the word "his" before "employees" narrowed the scope of the provision because "[t]he phrase 'his employees' could include 'his' former employees, but still exclude persons who have never worked for the particular employer being charged with

---

[12]The Court also noted that, in an analogous case, the term "employees" in 42 U.S.C. § 2000e(b) was temporally fixed by the inclusion of two "significant" temporal qualifiers: that the Act applied to any employer "who has fifteen or more employees for each working day . . . ." Robinson, 519 U.S. at 342 (emphasis in original).

retaliation." Id. at 344. The Court additionally found that use of the words "individual" or "applicant" in the provision failed to provide any insight into whether the term "employees" was limited only to current employees. These words, although broader in scope than "employees," could not reasonably be said to confine, by negative inference, the temporal scope of employees. Id. at 344-45. All this led the Court to conclude that the term "employees" was ambiguous as to whether it excluded former employees.

To resolve the ambiguity, the Court focused on the "broader context and ordinary purpose of the statute as a whole" to determine the scope of the term "employee." Castellano, 142 F.3d at 67. In addition to finding that a narrow reading of the word "employee" would potentially frustrate the primary purpose of the antiretaliation provision - "maintaining an unfettered access to statutory remedial mechanisms" - the Court found that a number of the statute's provisions clearly contemplate the use of Title VII's remedial mechanisms for former employees. Robinson, 519 U.S. at 345. Moreover, the Court concluded that "[i]nsofar as [the antiretaliation statute] expressly protects employees from retaliation for filing a charge under Title VII, and a charge . . . alleging unlawful discharge would necessarily be brought by a former employee, it is far more consistent to include former employees within the scope of 'employees' protected by [the antiretaliation statute]." Id. at 345. Ultimately, the Court was

troubled that a narrow reading of the term would "vitiate much of the protection afforded by [Title VII's antiretaliation statute]," because "an employer [would] be able to retaliate with impunity against an entire class of acts under Title VII - for example, complaints regarding discriminatory termination." Id. at 345-46.

c. The Majority Position

In the context of Title I of the ADA, (and not, as Robinson dealt with, Title VII) a majority of courts have determined that a former employee who is currently totally disabled is not a qualified individual with a disability within Title I of the ADA. See Weyer, 198 F.3d 1110; see also Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999); Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006 (6th Cir. 1996), rev'd on other grounds, 121 F.3d 1006 (6th Cir. 1997) (en banc); EEOC v. CAN Ins. Cos., 96 F.3d 1039 (7th Cir. 1996); Gonzales v. Garner Food Services, Inc., 89 F.3d 1523, 1531 (11th Cir. 1996); Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768 (8th Cir. 1987). These courts have all determined that the meaning of the term "qualified individual" is unambiguous and have rejected the contention that the plain language of section 12112 is anything other than a clear expression of Congress's intent "to limit the scope of the Act to only job applicants and current employees capable of performing essential functions of available jobs." Gonzales, 89 F.3d at 1528; see

Weyer, 198 F.3d at 1111 (concluding that to hold otherwise would "essentially render[] the qualified individual requirement under the Act, that an individual with a disability hold or desire a position the essential functions of which he or she can perform, meaningless.") (quoting Gonzales, 89 F.3d at 1529).

As noted above, although a number of these cases were decided before Robinson, the Ninth Circuit's decision in Weyer came after Robinson. The Weyer court declined to analogize Title I to Title VII concluding instead that "Title I of the Americans With Disabilities Act, unlike Title VII in the Civil Rights Act, is unambiguous." Weyer, 198 F.3d at 1111. Following Robinson's own directive that the "inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent," id., the Weyer court concluded that totally disabled persons were unambiguously excluded from the definition of "qualified individual" because the language in Title I, was temporally qualified. Id. at 1112.

Specifically, the court reasoned that because the term "qualified individual" is defined as someone who "can perform the essential functions of her job," the present tense of the phrase "can perform" requires that "one must be able to perform the essential functions of employment at the time that one is discriminated against in order to bring suit under Title I." Id. (emphasis added). Moreover, the court held that insofar as

discrimination must occur on account of the disability, the disability must exist at the time of the discrimination and "be the motivation for the discrimination." Id.

Justifying this reading, the court noted that "Congress could reasonably decide to enable disabled people who can work with reasonable accommodation to get and keep jobs, without also deciding to equalize post-employment fringe benefits for people who cannot work." Id. Likewise the court concluded that "holds" in the present tense refers to current employees and "desires" in the present tense refers to people who currently want jobs, as opposed to those who do not. For the court, "[t]his is language well designed to help people get and keep jobs, not to help these no longer able to work get disability pay." Id.

Of course, such an interpretation would appear to create a remedial gap in Title I's statutory scheme, because Title I guarantees the right to be free from discrimination in the provision of fringe benefits. See 42 U.S.C. §§ 12112(a), b(2). Under the holding of Weyer, some claimants who are disabled and are discriminated against in the provision of fringe benefits will not be allowed to seek redress under Title I. But, for the Ninth Circuit this gap merely highlights the "delicate compromise among competing interests and concerns" inherent in the democratic passage of legislation and is not, in and of itself, legally problematic. Weyer, 198 F.3d at 1113.

d. The Minority Position

The Second and Third Circuits, in contrast, have held that a totally disabled person who is no longer employed is nevertheless a "qualified individual" who may bring a discrimination claim under the ADA. These courts have concluded that the statutory language of Title I is ambiguous. The "ambiguity" is inferred from the "disjunction between the explicit rights created by Title I of the ADA and the ostensible eligibility standards for filing suit under Title I." Ford, 145 F.3d at 606. Recognizing that the scope of Title I's prohibition of discrimination extends to the provision of fringe benefits, including post-employment and disability benefits, these courts have refused to assign a plain meaning definition to the qualified individual eligibility requirement because it would effectively "undermine the plain purpose of sections 12112(a)[13] and (b)(2):[14] to provide comprehensive protection from discrimination

---

[13]Section 12112(a) states:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

[14]Section 12112(b)(2) states that the term "discriminate" includes :

> participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such

of fringe benefits." Castellano, 142 F.3d at 68.

Reasoning that "the definition of 'employee' under the ADA parallels that under Title VII and was intended to be given the 'same meaning,'" Castellano, 142 F.3d at 69, the Second and Third Circuits found Robinson's approach to determining ambiguity persuasive, with "the locus of ambiguity" centering on "whether the ADA contains a temporal qualifier of the term 'qualified individual with a disability.'" Ford, 145 F.3d at 606. Discerning no temporal qualifier, these courts determined that the term could reasonably be read to either include or exclude former employees who are totally disabled. Id. To resolve this ambiguity, these courts concluded that a narrow reading would undermine the ADA's underlying rationale of preventing discrimination regarding, among other things, fringe benefits. Id.

The district courts in this circuit that have addressed the question in full view of the conflicting circuit opinions are unanimously in accord with the minority position espoused by the Second and Third Circuits. See Fletcher, 367 F. Supp.2d at 104-106; Iwata, 349 F. Supp.2d at 144-47; Conners, 42 F.Supp.2d at 41-45. None of these decisions, however, offers much help in

---

> relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs)[.]

42 U.S.C. § 12112(b)(2).

resolving the conflict or amplifying the positions because, in all and without much discussion, the courts simply chose to adopt the minority position.

e. Resolving the Conflict

To be sure, the different positions staked out by the circuit courts are intractable and create an affirmative inter-circuit split on the meaning of the term "qualified individual" within Title I of the ADA, see Weyer, 198 F.3d at 1112, into which the First Circuit has yet to weigh in. The rub of the disagreement is in how to determine if the term "qualified individual" is ambiguous. As all the courts have faithfully noted, in Robinson, the Court framed the inquiry into ambiguity as one which "must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" 519 U.S. at 340 (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)). Not as many courts have noted Robinson's further instruction that "[t]he plainness or ambiguity of the statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 468, 477 (1992); McCarthy v. Bronson, 500 U.S. 136, 139 (1991)). Yet this maxim accords with the notion that statutory construction is a "holistic endeavor,"

Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004)(internal quotations and citations omitted), requiring that a term or provision be viewed not in isolation but rather within its proper context. See McCarthy, 500 U.S. at 139. Thus, in examining whether a term is ambiguous, all three factors may be relevant.

Here, viewed in context, the use of the present tense "can perform" imparts an unequivocal requirement to the definition of "qualified individual:" a person must be able to perform the essential functions of his job at the time the discrimination occurs in order to bring suit for discrimination under Title I. See Weyer, 198 F.3d at 1112. The term "can perform" is exactly the type of temporal reference - like "is employed" or "was employed" - that the word "employee" lacked in Title VII. "Can perform" is, moreover, a temporal qualifier similar to Title VII's "has fifteen." See Robinson, 519 U.S. at 341 n.2; § 2000e(b) ("The term employer means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day . . . ."). As the Robinson Court noted, "has fifteen" "specif[ies] the time frame in which the employment relationship must exist." Robinson, 519 U.S. at 341 n.2; see also Walters v. Metropolitan Ed. Enterprises, Inc., 519 U.S. 202, 207-08 (1997). So too here, "can perform" limits the claimants who may be eligible to bring a suit for discrimination under Title I to those who presently (or at the

time of the discriminatory act)[15] are capable of performing the essential functions of the job with or without a reasonable accommodation; it excludes those who, at the time of the alleged discriminatory act, are unable to perform the essential functions of employment.[16]

---

[15]A nuance here should be pointed out, but does not require extensive discussion. The question of when the discriminatory act "occurs" in the context of a benefit-based ADA case may become quite important, as it did in Castellano. There, the plaintiffs were not disabled when they retired (the point at which their employment ended and at which their benefits vested). After later becoming totally disabled, the plaintiffs were denied certain retirement and disability benefits to which they believed they were entitled. In an effort to bridge these facts with its view of the statutory meaning of "qualified individual," the court viewed the plaintiffs' ability to perform the essential job functions at the point in time the benefits accrued, not when they were denied. See Castellano, 142 F.3d at 69 (noting that "many fringe benefits are earned during years of service before the employment has terminated but are provided in years after the employment relationship has ended," and therefore, because the provision of fringe benefits defied any "temporally discrete[] discriminatory employment action . . . 'qualified individuals' included retired employees who, at the time of their retirement could have performed the essential functions of their job"). This interpretive feat saved the plaintiffs' case, and while it is difficult to square with the plain language of the statute, see Weyer, 198 F.3d at 1111-12, it arguably poses an additional interpretive layer onto the meaning and scope of Title I of the ADA. Nevertheless, this Court need not address this specific factual scenario inasmuch as Hatch became totally disabled during his employment and before he retired and has never alleged that the discriminatory act somehow referred back to before his termination (indeed, the alleged discriminatory act is clearly discrete in both time and scope relating, as it does, to the calculation "mistake" of his LTD benefits).

[16]As should be clear, this interpretation therefore does not hinge on the presence of the words "holds" and "desires," although these present tense words add additional support to the interpretation. This is because, as the Court in Robinson instructed, terms like these may reasonably refer to former employees who still desire to work but, because of their

This conclusion is also substantially in accord with the reasoning of Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999). There, the Court was asked to address the effect of potential discrepancies between Social Security Disability Insurance ("SSDI") statements and ADA statements made by SSDI applicants. In concluding that an applicant was entitled to account for any discrepancies between the statements (before her claims could be dismissed), the Court explained that discrepancies could occur because:

> [a]n ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability" - that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case . . . .

Id. at 806 (Breyer, J.); see also Gelabert-Ladenheim, 252 F.3d at 59-60. The logic in Cleveland is consistent with a plain meaning reading of Title I that "can perform" means an applicant currently (at the time of the alleged discriminatory act) must be able to work. Consequently, Hatch, who at all relevant times was totally disabled, is unable to meet the threshold requirement that he be a "qualified individual with a disability" under Title I of the ADA. His claim for discrimination must, therefore, be dismissed.

The resulting remedial gap is mitigated in part by ERISA's

---

disability, no longer are able to do so. See Robinson, 519 U.S. at 846-47 (construing the term "employed" to mean either "is employed" or "was employed").

alternative statutory enforcement scheme which seeks to police just the kind of fringe benefit abuses alleged in this case. Indeed, ERISA "is a comprehensive and reticulated statute," Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998) (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361 (1980)), and "governs the rights and responsibilities of parties in relation to employee pension and welfare plans." Id. Moreover, ERISA includes a cause of action for plan participants, and other beneficiaries, "to recover benefits due to him [or her] under the terms of his [or her] plan." Id. (quoting 29 U.S.C. § 1132(a)(1)(B)). Thus, where a plan participant's benefits have been impermissibly altered or terminated, he may bring a claim under ERISA to recover the alleged erroneously-terminated benefits. See 29 U.S.C. § 1132(a). It is, therefore, "under this statutory provision that claims, such as this one, challenging denials and termination of employer-sponsored disability benefits are brought." Terry, 145 F.3d ay 34.[17]

2. Retaliation

---

[17]To be sure, ERISA does not entirely bridge the remedial gap rendered by a narrow reading of Title I's "qualified individual" requirement. Because ERISA addresses the provision of benefits, employees who have yet to receive any benefits (in most cases because they are still working) and who become totally disabled may not have a remedy to redress alleged acts of discrimination. Additionally, damages in ERISA suits are limited and not congruent with damages under the ADA. But such a disabled employee has other options, including worker's compensation and temporary disability insurance.

Hatch does not face the same threshold hurdle with respect to his retaliation claim because 42 U.S.C. § 12203, the ADA's anti-retaliation provision, bars discrimination against "any individual," not just "qualified individuals with a disability." Nevertheless, Pitney Bowes challenges on two separate grounds the Magistrate Judge's conclusion that Hatch could make out a prima facie case[18] of retaliation under section 12203.[19]

This court reviews the Magistrate Judge's recommendations de novo, Fed. R. Civ. P. 72(b), but, when deciding a Rule 12(b)(6) motion to dismiss, dismissal will be inappropriate unless "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Although the plaintiff is entitled to all reasonable inferences, "bald assertions, unsupportable conclusions, . . . and the like need not be credited." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

---

[18]To state a prima facie case of retaliation under the ADA, a complaint must allege that: (1) the plaintiff engaged in ADA protected conduct; (2) the plaintiff was thereafter subjected to an adverse action; and (3) a causal connection exists between the protected conduct and the adverse action. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 177 (1st Cir. 2003).

[19]The provision states, in relevant part:
(a) Retaliation
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203.

Nevertheless, "the complaint will survive as long as it pleads sufficient facts to warrant recovery on any cognizable theory of the case." Tompkins v. United Healthcare of New England, 203 F.3d 90, 93 (1st Cir. 2000).

Pitney Bowes first contends that Hatch failed to allege any adverse employment action; specifically, that "providing [Hatch] his appropriate Plan benefit cannot, as a matter of law, constitute an 'adverse' action." But this pronouncement fails to grasp the gravamen of Hatch's complaint. In this case, Hatch has alleged that the recalculation of his benefit amount was undertaken in retaliation for his filing of a charge of discrimination with the Rhode Island Commission for Human Rights and the United States Equal Employment Opportunity Commission and for pursuing a civil suit in this court to redress certain disability discrimination. Such a claim of injury is legally cognizable under the anti-retaliation provision of Title I. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (noting that an adverse employment action under Title VII includes "a decision causing a significant change in benefits"); Hildebrandt v. Illinois Dep't of Natural Res., 347 F.3d 1014, 1030 (7th Cir. 2003). Indeed, especially in light of the recent pronouncement in Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006), a claim concerning the discriminatory process of determining fringe benefits is entitled to protection under the anti-retaliation

provision of Title I of the ADA. There, the Supreme Court held that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment related retaliatory acts and harm," and announced the standard for determining what constitutes an adverse employment action as whether "a reasonable employee would have found the challenged action materially adverse, . . . [meaning] 'it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Hence, drawing all inferences in favor of Hatch, the complaint alleges a sufficiently adverse action, namely that his benefit amount was reduced in retaliation for his bringing claims of discrimination against Pitney Bowes, such that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. It may ultimately turn out that the "corrected" benefit amount is an accurate reflection of the amount due to Hatch. For now, however, Hatch has alleged that the process by which the amount was "recalculated" was discriminatory - i.e., that Pitney Bowes either: (1) adjusted only his benefit amount and not that of other employees; or (2) changed its interpretation of the correct benefit calculation in retaliation for his bringing discrimination actions. Either theory alleges a sufficiently adverse action to establish that element of a prima facie case.

Next, Pitney Bowes argues that no causal connection exists

between the alleged retaliatory action and the protected conduct. Specifically, Pitney Bowes contends that, due to the almost four-year length of time between the discrimination filings and the recalculation of benefits, any assumption of a causal connection is unwarranted. The Magistrate Judge disagreed with both Pitney Bowes's characterization of the period between protected conduct and adverse action and the relevance such passage of time should have.

This court agrees with the Magistrate Judge that Pitney Bowes appears to have mischaracterized the length of time between the relevant acts. Although Hatch initiated a claim of discrimination against Pitney Bowes in 1999, that claim was not settled until March of 2002. Thus, for purposes of determining the time of the protected conduct, the dismissal of the suit is appropriate because it marks the end of the protected conduct. Consequently, a period of fifteen months elapsed between the protected conduct and the alleged retaliatory act. Nevertheless, "the inference of a causal connection becomes tenuous with the passage of time," Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir. 2003), and even a nine month period between the protected conduct and alleged retaliation may undermine the inference of causation. Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991). The Magistrate Judge admitted that fourteen months was "at the outer limits" of the temporal proximity between two events that could give rise to an

inference of causal connection, and, indeed, this is the case. See Centro Medico del Turabo, Inc. v. Feliciano de Melencio, 406 F.3d 1, 11 n.4 (1st Cir. 2005) (lapse of "roughly two years" undercuts proof of a causal connection); Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003) (a span of eighteen months undermined an inference of causal connection); Dressler, 315 F.3d at 79-80 (a passage of two years renders a causal connection "tenuous"); Lewis v. Gillette Co., 22 F.3d 22, 25 (1st Cir. 1994) (a period of two years undermined causal inference). But Hatch is correct that there is no absolute rule establishing a point in time beyond which a claim for retaliation is never cognizable. Moreover, to survive a motion to dismiss under Rule 12(b)(6), a complaint need not plead facts sufficient to defeat summary judgment. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002). Rather, it must only contain factual predicates sufficient to "warrant recovery on any cognizable theory of the case." Tompkins, 203 F.3d at 93. In light of the liberal pleading requirements under Rule 12(b)(6), the fourteen month time period does not undermine the inference of causality so completely as to compel granting the motion to dismiss under Rule 12(b)(6). See Conley, 355 U.S. at 45-46; Tompkins, 203 F.3d 90, 93 (1st Cir. 2000); Tyler v. Univ. of Louisville, 2006 WL 3412273 (W.D.Ky. Nov 27, 2006); Hoshak v. Sysco Food Services of Pittsburgh, LLC., 2006 WL 2945357 (W.D.Pa. Oct 13, 2006). Consequently, the objection to the R&R on this account will be

denied and this Court will adopt the Magistrate Judge's recommendation to deny the motion to dismiss Count IV.

B. Counts V and VI

In Counts V and VI, Hatch alleges that the same conduct actionable under the ADA for discrimination and retaliation constitutes violations of the state corollaries, the Rhode Island Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-7, and the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1. The Magistrate Judge, applying the same reasoning used to deny Pitney Bowes's motion to dismiss Count IV, similarly denied the motion to dismiss Counts V and VI. In its objection, Pitney Bowes advances the same arguments made with respect to Count IV. Consequently, this court will, consistent with its previous discussion, grant the objection to the R&R with respect to the claims for discrimination, but deny the objection with respect to the claims for retaliation under RIFEPA and RICRA.

IV. Conclusion

For the foregoing reasons, Defendant's Objections to the R&R are GRANTED in part and DENIED in part and Plaintiff's Objections to the R&R are DENIED. The portions of the R&R addressing Counts I, II, III, VII, VIII and IX are adopted in both reasoning and result. See R&R at 6-28; 40-41. The portions of the R&R

addressing Counts IV, V, and VI are adopted in part and rejected in part for the reasons discussed above. Accordingly, Counts I, II, III, VII, VIII, and IX are all dismissed. The discrimination claims in Count IV, V, and VI are dismissed, while the retaliation claims under those Counts can proceed. As recommended by the Magistrate Judge, Hatch is permitted to file an amended complaint.

It is so ordered.

WESmith

William E. Smith
United States District Judge
Date: 4/24/07